IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


PATTY L. SHACKLEFORD,

                Plaintiff,

     vs.                              Civil Action 2:12-cv-398
                                          Judge Graham
                                          Magistrate Judge King

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.


## REPORT AND RECOMMENDATION

### I.    Background

    This is an action instituted under the provisions of 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security denying plaintiff's applications for disability insurance benefits and supplemental security income.  This matter is now before the Court on *Plaintiff's, Patty L. Shackleford's, Statement of Errors* ("*Statement of Errors*"), Doc. No. 13, the *Defendant's Memorandum in Opposition* ("*Commissioner's Response*"), Doc. No. 18, and *Plaintiff's, Patty L. Shackleford, Reply to Defendant's Memorandum in Opposition*, Doc. No. 19.

    Plaintiff Patty Shackleford filed applications for benefits on November 6, 2008, alleging that she has been disabled since September 11, 2008.  *PAGEID* 62, 221, 228.  The applications were denied initially and upon reconsideration, and plaintiff requested a *de novo* hearing before an administrative law judge.

    An administrative hearing was held on January 31, 2011, at which

plaintiff, represented by counsel, appeared and testified, as did Richard P. Oestreich, Ph.D., who testified as a vocational expert. *PAGEID* 62, 85.  In a decision dated April 19, 2011, the administrative law judge concluded that plaintiff was not disabled from November 6, 2008, through the date of the administrative decision.  *PAGEID* 77. That decision became the final decision of the Commissioner of Social Security when the Appeals Council declined review on March 17, 2012. *PAGEID* 54.

Plaintiff was 48 years of age on the date of the administrative law judge's decision.  *See PAGEID* 76, 221.  She has at least a high school education, is able to communicate in English, and has past relevant work as a factory assembler.  *PAGEID* 76.  Plaintiff was last insured for purposes of disability insurance benefits on December 31, 2010.  *PAGEID* 62.  She has not engaged in substantial gainful activity since September 11, 2008, her alleged onset date.  *PAGEID* 64.

**II.  Medical Evidence[1]**

Plaintiff presented at an emergency room in November 2006 for complaints of right knee pain of four days' duration.  *PAGEID* 392. Examination of the knee revealed some tenderness, but no effusion, palpable cords, warmth, swelling, or induration.  *PAGEID* 393.  An x-ray showed mild degenerative changes in the right knee with no acute abnormality.  *PAGEID* 394.  Plaintiff left the hospital prior to completing treatment.  *Id*.

---

[1] Plaintiff's *Statement of Errors* challenges the administrative law judge's evaluation of Listing 1.02A, the administrative law judge's residual functional capacity assessment, and the administrative law judge's alleged failure to follow the treating physician rule when evaluating Dr. Hamill's opinion.  The Court will therefore limit its discussion to those issues.

In June 2007, plaintiff was transported to the emergency room due to "rather inflammatory behavior" after a domestic incident and altercation with the police. *PAGEID* 384-389. Plaintiff reported, among other things, that she had been stressed about raising her grandchildren. *PAGEID* 387. Clinical findings included full range of motion and no restriction of movement in her extremities. *PAGEID* 384. She was discharged after a psychiatric consultation found no risk of injury to herself or others. *PAGEID* 386.

Jeffrey Lobel, M.D., saw plaintiff in February 2008 for complaints of low back pain that occasionally radiated to the anterior thighs. *PAGEID* 435-36. Upon physical examination, plaintiff was "able to ambulate without difficulty;" she was able to pick up a grandchild who had accompanied her to the appointment. *Id*. Plaintiff declined to be evaluated by a pain service for possible injections and opted to continue to treat with her chiropractor. *Id*.

On June 4, 2008, plaintiff complained to W. Bradley Strauch, M.D., of right knee pain, especially with stairs. *PAGEID* 432-33. Dr. Strauch noted "no instability," *id*., and diagnosed right quadriceps tendonitis. Plaintiff refused physical therapy. *Id*. Plaintiff was fitted for a knee brace and was instructed to start general stretching exercises. *Id*. In a July 23, 2008 follow up appointment, plaintiff reported pain a few days a week with activity. Dr. Strauch diagnosed right patellofemoral knee pain and right patellar tendonitis. *PAGEID* 431. Plaintiff refused corticosteroid injections and physical therapy. *Id*.

Plaintiff treated with Ellis Frazier, M.D., a family practice specialist, between February 2007 and July 2010. *PAGEID* 446-58, 505-06, 599, 601, 674, 754, 756, 758, 778. Plaintiff reported knee pain on at least eight occasions. *See id.* In September 2007, March 2008, and August 2008, plaintiff reported that she was the "primary support for" and caretaker of her grandchildren. *PAGEID* 449, 451, 453. In January 2008, plaintiff reported difficulty with activities of daily living; she could sit for only 20 minutes. *PAGEID* 453. However, she reported in November 2008 that she walked several times per day. *PAGEID* 446-49.

Plaintiff treated with Christopher F. Hyer, DPM, FACFAS, on June 10, 2008 for bilateral plantar pain. *PAGEID* 429. Dr. Hyer diagnosed fibromyalgia, bilateral metatarsalgia, bilateral pes planovalgus deformity, and bilateral post tib tendon insufficiency. *PAGEID* 430. Dr. Hyer prescribed a custom orthotic and opined that plaintiff would probably experience a permanent degree of baseline pain in her feet. *Id*.

An October 15, 2008 MRI of plaintiff's right knee showed high-grade patellofemoral chondromalacia and mild medial capsulitis without internal derangement such as meniscal or cruciate tear. *PAGEID* 577. The findings were not substantially changed from a December 2006 study. *Id*.

J. Mark Hamill, M.D., first began psychiatric treatment of plaintiff on December 4, 2008. *PAGEID* 478-84. Dr. Hamill noted manic symptoms; plaintiff also reported seeing ghosts and hearing voices. *PAGEID* 483-84. Dr. Hamill diagnosed bipolar disorder, manic, severe

with psychotic features, and r/o schizoaffective disorder, bipolar type. *Id.*

Plaintiff reported knee pain and difficulty with prolonged standing, walking, and sitting to James J. Sardo, M.D., in December 2008. *PAGEID* 517-20. Her gait was antalgic, favoring the right lower extremity. *PAGEID* 593.

Plaintiff began treating with Charles M. Fields, M.D., and Ryan T. Bunch, D.O., in October 2008 for right knee pain of approximately one year's duration. *PAGEID* 540-43. Plaintiff walked with an antalgic gait. *PAGEID* 543. Dr. Bunch performed a surgical arthroscopy of the right knee with chondroplasty and abrasion arthrosplasty of the patella on January 19, 2009. *PAGEID* 521. Plaintiff was diagnosed both pre- and post-operatively with osteoarthritis right knee. *Id.* She demonstrated a steady gait on January 30, 2009. *PAGEID* 589. In a February 3, 2009 postoperative follow-up with Dr. Fields, plaintiff stated that "she is doing reasonably well after surgery." *PAGEID* 541. Although she still experienced discomfort, it was improved. She walked with a normal gait. *Id.*

On February 5, 2009, plaintiff reported to Dr. Fields that she had re-injured her knee. She rated her pain as a ten on a ten-point scale. *Id.* Dr. Fields diagnosed chondromalacia patella and patella femoral arthritis and administered a synvisc injection. *Id.* On February 12, 2009, plaintiff reported that the injection had not alleviated her pain and that her knee inhibited her ability to walk. *Id.* Dr. Fields noted an antalgic gait. *Id.*

On February 19, 2009, plaintiff reported to Dr. Bunch that her knee pain, which had lasted for approximately eight months, interfered with her activities of daily living and ambulation. *PAGEID* 538-39, 554-55. Upon examination, there was "tenderness [to] palpation about the right knee primarily in the anterior aspect. There is a 2+ effusion. There is crepitus under the patella with range of motion" and pain with patellar compression. *Id.*

Dr. Bunch performed a patellofemoral replacement of the right knee on February 23, 2009. *PAGEID* 557-58. Plaintiff was diagnosed, before and after the surgery, with severe osteoarthritis of the right patellofemoral joint. *Id.* On March 6, 2009, plaintiff reported doing well postoperatively: she was able to ambulate without difficulty; she had occasional pain at night but no other complaints. *PAGEID* 540. On March 30, 2009, there was no evidence of effusion and her gait was mildly antalgic. *PAGEID* 572. On April 2, 2009, plaintiff reported doing very well postoperatively, with improving pain symptoms, but "some mild discomfort with strenuous activities." *Id.* June 3, 2009 x-rays of plaintiff's knee were satisfactory; she demonstrated excellent range of motion. *Id.* On October 8, 2009, plaintiff reported that her "right knee is feeling significantly better," but that she was having pain after a fall. *PAGEID* 740-41. On October 29, 2009, plaintiff complained to Dr. Bunch of shoulder pain, but "no other complaints." *PAGEID* 741. Dr. Bunch noted on October 8, October 29, and November 5, 2009 that plaintiff walked with a normal gait. *PAGEID* 740-41. On November 5, 2009, Dr. Bunch decided to "not proceed

6

with treatment" due to "the resolution of [plaintiff's] symptoms." *PAGEID* 740.

On December 31, 2009, plaintiff fell out of a U-Haul truck "after having tried to help her daughter quickly move out of" her home for 14 hours. *See PAGEID* 751, 756. Plaintiff "was doing okay and feeling fairly well [until] she fell and injured herself." *PAGEID* 756.

At an office visit with Dr. Bunch on January 5, 2010, plaintiff complained of "occasional intermittent pain with the right knee particularly with climbing stairs." *PAGEID* 749. Dr. Bunch noted that plaintiff "walks with a normal gait." He administered an injection of DepoMedrol. *Id*.

Plaintiff continued to treat with Dr. Hamill, her psychiatrist, through at least September 2010. *PAGEID* 646-47, 684, 745-46, 789. On March 18, 2009, plaintiff reporting trying to help her daughter with child care and being unable to stand and cook. *PAGEID* 647. On April 27, 2009, plaintiff reporting "doing the walking" and was "making progress since her knee surgery." *PAGEID* 645. She had also been walking six blocks to "pay court costs at the rate of $5.00 a month." *Id*. In August 2009, plaintiff reported that she was still hearing voices, but was doing better overall. *PAGEID* 684. Dr. Hamill noted that plaintiff seemed anxious. *Id*. On October 22, 2009, Dr. Hamill commented: "It turns out [plaintiff] is not psychotic but life has been quite stressful and chaotic lately. Given the circumstances she seems to be handling it well." *PAGEID* 746. On January 24, 2010, plaintiff reported that her mood was good. Dr. Hamill noted no

7

psychotic symptoms and no suicidal or homicidal ideation.  According to Dr. Hamill, plaintiff "looks like she is doing well."  *PAGEID* 745.

On June 29, 2009, Marianne Collins, Ph.D., reviewed the record and completed a mental residual functional capacity assessment and a psychiatric review technique form at the request of the state agency. *PAGEID* 656-73.  According to Dr. Collins, plaintiff had moderate restrictions in activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace.  *PAGEID* 666.  Plaintiff was not significantly limited in 14 of 20 areas of mental functioning and was moderately limited in the following six areas: (1) the ability to understand and remember detailed instructions, (2) the ability to carry out detailed instructions, (3) the ability to maintain attention and concentration for extended periods, (4) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, (5) the ability to interact appropriately with the general public, and (6) the ability to respond appropriately to changes in the work setting.  *PAGEID* 670-71.

On July 23, 2009, Dr. Hamill completed a mental impairment questionnaire.  *PAGEID* 677-83.  According to Dr. Hamill, plaintiff had "some trouble with comprehension and memory," she has "difficulty thinking or concentrating," and "extreme" "[d]ifficulties in maintaining concentration, persistence or pace."  *PAGEID* 679, 81.  He opined that plaintiff was seriously limited in, but not precluded from, (1) maintaining attention for a two hour segment, (2) sustaining

8

an ordinary routine without special supervision, (3) working in coordination with or proximity to others without being unduly distracted, (4) getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, (5) responding appropriately to changes in routine work setting, (6) dealing with normal work stress, and (7) understanding and remembering detailed instructions. *PAGEID* 679-80. Plaintiff was unable to meet competitive standards in (1) her ability to maintain regular attendance and be punctual within customary, usually strict tolerances, (2) complete a normal workday and workweek without interruptions from psychologically based symptoms, and (3) to carry out detailed instructions. *Id*. Plaintiff had moderate limitations in activities of daily living and in maintaining social functioning, and "[n]o useful ability" to perform at a consistent pace without an unreasonable number and length of rest periods. *Id*. Finally, Dr. Hamill anticipated that plaintiff's impairments or treatment would cause her to be absent from work more than four days per month. *PAGEID* 683.

Dr. Hamill completed a second mental impairment questionnaire on April 13, 2010 which reflected many of the same limitations. *PAGEID* 761-66. Dr. Hamill opined that plaintiff was less functional in her ability to (1) carry out very short and simple instructions, (2) accept instructions and respond appropriately to criticism from supervisors, (3) respond appropriately to changes in a routine setting, (4) set realistic goals or make plans independently of others, (5) maintain attention for a two hour segment, and (6) deal

with normal work stress. *PAGEID* 763-64. Plaintiff was more functional in her ability to (1) complete a normal workday and workweek without interruptions from psychologically based symptoms, (2) carry out detailed instructions, and (3) perform at a consistent pace without an unreasonable number and length of rest periods; she could now satisfactorily (1) get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes and (2) understand and remember detailed instructions; she had no more than mild limitation in activities of daily living. *PAGEID* 763-65.

On September 15, 2009, W. Jerry McCloud, M.D., completed a physical residual functional capacity assessment at the request of the state agency. *PAGEID* 697-704. According to Dr. McCloud, plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry ten pounds, stand and/or walk for six hours in an eight hour workday, and sit for six hours in an eight hour workday; she would not be limited in her ability to push or pull. *PAGEID* 698. Plaintiff could never climb ladders, ropes, or scaffolds, could occasionally crawl, and could frequently stoop and crouch. *PAGEID* 699. Plaintiff would be limited to only occasional overhead reaching on the left due to tendenosis. *PAGEID* 700.

Dr. Frazier, plaintiff's family practitioner, saw plaintiff in July 2010 for a "checkup" and, noting that plaintiff "need[ed] a prescription for a disability placard," completed a script as follows: "Patient with multiple health problems and has chronic disability warranting disability placard. Lifetime disability." *PAGEID* 777-782.

10

### III.  January 31, 2011 Administrative Hearing

Plaintiff testified at the administrative hearing that she is unable to work because she can stand for only ten to 15 minutes at a time and has carpal tunnel syndrome and a left shoulder injury. *PAGEID* 93.  Plaintiff also mentioned, in response to questioning, depression and pain in her legs and feet that lasts eight to nine hours every day.  *PAGEID* 93-95.  She testified that, in an eight hour day, she could sit for two hours, stand for 40 minutes, and walk for 40 minutes, but would then need to lie down for the remainder of the day.  *PAGEID* 109.

Plaintiff also testified that she can stand for a half an hour before having difficulty, she could walk four to five blocks, and could sit for 15 to 20 minutes at a time.  *PAGEID* 100-01.  She has trouble crouching, stooping, and bending, but has no problems reaching in any direction, using her fingers to pick things up, or pushing and pulling.  *PAGEID* 101-02.  She can lift ten pounds.  *PAGEID* 101.

At the time of the hearing, plaintiff's daughter and her daughter's five children, aged 1, 2, 3, 5, and 7, lived with plaintiff.  *PAGEID* 103-04.  Plaintiff testified, however,  that she does not care for the grandchildren when her daughter is at work because they have an "alternative babysitter."  *PAGEID* 104-06.

Plaintiff testified that, on a typical day, she arises at 6:30 or 7:00 in the morning to make sure that her grandchildren "get up to go to school."  *PAGEID* 103.  Plaintiff watches television for one and a half hours a day, but she this activity is interrupted by her grandchildren and neighbors who visit.  *PAGEID* 103, 107-08, 110-11.

Plaintiff spends seven or eight hours a day organizing her house.  *Id*.
Plaintiff makes sure that her grandchildren pick up their toys.  She
does dishes and laundry, cooks dinner, takes the trash out, and bends
over to put pots, pans, and groceries in cabinets.  However, she must
take breaks because of leg pain.  *PAGEID* 107-08, 112.  Plaintiff also
drives to the grocery store once a week and shops for a half an hour.
*Id*.

Plaintiff also testified that she hears voices but that she has
not mentioned that fact to Dr. Hamill because she is afraid that he
will change her medication to a more expensive product.  *PAGEID* 113-
14.

The vocational expert testified that plaintiff has past relevant
work as a fast food worker, factory assembler, and forklift operator.
*PAGEID* 115.  Asked to assume a claimant with plaintiff's vocational
profile and the residual functional capacity for a reduced range of
light work, as ultimately found by the administrative law judge, the
vocational expert testified that such a claimant could perform
plaintiff's past relevant work as a factory assembler.  *PAGEID* 116-18.
The vocational expert also testified that such a claimant could
perform other work that exists in significant numbers in the local and
national economy, including such jobs as assembler (<u>Dictionary of
Occupational Titles</u> ("DOT") 706.684-022), housekeeper (DOT 381.687-
018), and inspector (DOT 727.687-062).  *PAGEID* 116-19.

**III.  Administrative Decision**

The administrative law judge found that plaintiff's severe
impairments consist of osteoarthritis of the right knee; degenerative

12

joint disease of the left shoulder; degenerative disc disease of the cervical, thoracic, and lumbar spine; fibromyalgia; depressive disorder; and bipolar disorder, manic, severe with psychosis. *PAGEID* 64. The administrative law judge also found that plaintiff's impairments neither meet nor equal a listed impairment, including Listing 1.02. *PAGEID* 67-70.

With regard to Listing 1.02, which addresses major dysfunction of a joint, the administrative law judge found that "the specified criteria required of the listing [were] not demonstrated by the available medical evidence" and that the "evidence does not demonstrate that the claimant has the degree of difficulty in ambulating as defined in 1.00B2b." *PAGEID* 68.

The administrative law judge went on to find that plaintiff has the residual functional capacity ("RFC") to perform light work, except that she would be limited to

> unlimited pushing and pulling; no climbing of ramps or stairs; avoiding all exposure to operational control of moving machinery and unprotected heights; and work is limited to simple, routine, and repetitive tasks with no fast paced production requirements and with only brief and superficial interaction with the public, co-workers, and supervisors.

*PAGEID* 70. The administrative law judge found that this RFC would permit the performance of plaintiff's past relevant work as a factory assembler. *PAGEID* 75-76. The administrative law judge also relied on the testimony of the vocational expert to find that plaintiff is able to perform other jobs that exist in significant numbers in the national economy, despite her impairments. *PAGEID* 76-77. Accordingly, the administrative law judge concluded that plaintiff was

not disabled within the meaning of the Social Security Act from September 11, 2008, through the date of the administrative law judge's decision. *Id*.

## IV.  Discussion

Pursuant to 42 U.S.C. § 405(g), judicial review of the Commissioner's decision is limited to determining whether the findings of the administrative law judge are supported by substantial evidence and employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389 (1971); *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005).  Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Buxton v. Haler*, 246 F.3d 762, 772 (6th Cir. 2001); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  This Court does not try the case *de novo*, nor does it resolve conflicts in the evidence or questions of credibility.  *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, this Court must examine the administrative record as a whole.  *Kirk*, 667 F.2d at 536.  If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if this Court would decide the matter differently, *see Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion.  *Longworth,* 402 F.3d at 595.

Plaintiff argues, first, that the administrative law judge

14

erred in failing to accord controlling weight to the opinion of her
treating psychiatrist, Dr. Hamill. *Statement of Errors*, pp. 16-21.
The opinion of a treating source must be given controlling weight if
that opinion is "well-supported by medically acceptable clinical and
laboratory diagnostic techniques" and is "not inconsistent with the
other substantial evidence in [the] case record." 20 C.F.R. §
404.1527(c)(2). Even if the opinion of a treating source is not
entitled to controlling weight, an administrative law judge is
nevertheless required to determine how much weight the opinion is
entitled to by considering such factors as the length, nature and
extent of the treatment relationship, the frequency of examination,
the medical specialty of the treating physician, the extent to which
the opinion is supported by the evidence, and the consistency of the
opinion with the record as a whole. 20 C.F.R. §§ 404.1527(c)(2)-(6),
416.927(c)(2)-(6); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406
(6th Cir. 2009); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th
Cir. 2004). Moreover, an administrative law judge must provide "good
reasons" for discounting the opinion of a treating source, *i.e.*,
reasons that are "'sufficiently specific to make clear to any
subsequent reviewers the weight the adjudicator gave to the treating
source's medical opinion and the reasons for that weight.'" *Rogers v.
Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting Soc.
Sec. Rul. 96-2p, 1996 WL 374188, at *5). This special treatment
afforded to the opinions of treating providers recognizes that

> "these sources are likely to be the medical professionals
> most able to provide a detailed, longitudinal picture of
> [the claimant's] medical impairment(s) and may bring a

15

> unique perspective to the medical evidence that cannot be
> obtained from the objective medical findings alone or from
> reports of individual examinations, such as consultative
> examinations or brief hospitalizations."

*Wilson*, 378 F.3d at 544 (quoting 20 C.F.R. § 404.1527(d)(2)).

Dr. Hamill opined in July 2009 and April 2010 that plaintiff's mental condition imposed numerous limitations. *PAGEID* 677-83, 763-65. In April 2010, Dr. Hamill opined that plaintiff was unable to meet competitive standards in her ability to (1) maintain attention for a two hour segment, (2) deal with normal work stress, (3) perform at a consistent pace without an unreasonable number and length of rest periods, and (4) maintain regular attendance and be punctual within customary, usually strict tolerances. *PAGEID* 763. He also opined that plaintiff was seriously limited in eight areas; she also had an extreme limitation in her ability to maintain concentration, persistence, or pace, and a moderate limitation in her ability to maintain social functioning. *PAGEID* 763-64. Finally, Dr. Hamill anticipated that plaintiff's impairments or treatment of her impairments would cause her to be absent from work more than four days per month. *PAGEID* 766. Dr. Hamill's July 2009 opinion reflected similar limitations. *See PAGEID* 677-83.

The administrative law judge categorized Dr. Hamill as a "treating psychiatrist," expressly considered Dr. Hamill's medical opinions, and provided specific reasons for assigning "little weight" to those opinions:

> I find that Dr. Hamill's opinion is not supported by the
> evidence in the record. Specifically, Dr. Hamill's opinion
> about the claimant's extreme limitation in the area of
> concentration, persistence, or pace contrasts sharply with

16

the other evidence of record, especially the claimant's
activities of daily living where she cares for at least
five young grandchildren and an ailing daughter, which
renders it less persuasive.  In addition, as with the
opinions of Dr. Frazier, Dr. Hamill almost exclusively
relies on the claimant's subjective report of her symptoms
and limitations.  This is even more disconcerting because
the claimant does not have a significant mental health
treatment history despite her extreme allegations of
auditory hallucinations.  Also, the claimant admitted at
the hearing that she omits material information about her
symptoms to Dr. Hamill for fear that he might change her
medication.  Lastly, while Dr. Hamill does have a treating
relationship with the claimant, the treatment history has
been brief and intermittent and primarily consists of
medication management.  I give Dr. Hamill's opinion little
weight.

*PAGEID* 74-75.  The administrative law judge's analysis is sufficiently

specific as to the weight given to Dr. Hamill's medical opinion and

the reasons for assigning that weight.  Although the analysis of

individual factors may be succinct, it is clear that the

administrative law judge considered each of the factors listed in 20

C.F.R. §§ 404.1527(c)(2)-(6) and 416.927(c)(2)-(6); a formulaic

recitation of the factors is not required under the circumstances.

*See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir.

2010) ("If the ALJ's opinion permits the claimant and a reviewing

court a clear understanding of the reasons for the weight given a

treating physician's opinion, strict compliance with the rule may

sometimes be excused.").  Further, the administrative law judge's

reasons for assigning "little weight" to Dr. Hamill's opinion are

supported by substantial evidence.

Because the administrative law judge correctly applied the

standards of the treating physician rule to her evaluation of Dr.

Hamill's opinions, and because substantial evidence supports her

findings, the Court finds no error with the Commissioner's decision in this regard.

Plaintiff also argues that the administrative law judge erred in concluding that plaintiff does not meet the requirements of Listing 1.02A. *Statement of Errors*, pp. 22-26. Specifically, plaintiff argues that the administrative law judge erred in finding that plaintiff "did not have the degree of difficulty ambulating effectively as defined in Listing 1.00(B)(2)(b)." *Id*.

Listing 1.02 requires, under appropriate circumstances, a finding of disability based on a major dysfunction of a joint:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b[.]

20 C.F.R. Pt. 404, Subpt. P, Appx. 1, § 1.02. Listing 1.00B2b provides:

> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . .
> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient

distance to be able to carry out activities of daily
living. They must have the ability to travel without
companion assistance to and from a place of employment or
school.  Therefore, examples of ineffective ambulation
include, but are not limited to, the inability to walk
without the use of a walker, two crutches or two canes, the
inability to walk a block at a reasonable pace on rough or
uneven surfaces, the inability to use standard public
transportation, the inability to carry out routine
ambulatory activities, such as shopping and banking, and
the inability to climb a few steps at a reasonable pace
with the use of a single hand rail.  The ability to walk
independently about one's home without the use of assistive
devices does not, in and of itself, constitute effective
ambulation.

20 C.F.R. Pt. 404, Subpt. P, Appx. 1, § 1.00B2b.

Plaintiff argues that Dr. Frazier's March 23, 2011 notes, which
indicate that plaintiff had "limited ambulation" and needed "to use a
cane to walk," *see PAGEID* 880, combined with plaintiff's testimony at
the administrative hearing, establish that plaintiff "is unable to
walk a block at a reasonable pace on rough or uneven surfaces."
*Statement of Errors*, pp. 22-23.  Plaintiff's arguments are without
merit.

First, Dr. Frazier's March 23, 2011 notes were not available to
the administrative law judge.  Such evidence, even if submitted to the
Appeals Council, may not be considered by this Court for purposes of
substantial evidence review of the administrative law judge's
decision. *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007);
*see also Cline v. Comm'r of Social Security,* 96 F.3d 146, 148 (6th Cir.
1996); *Cotton v. Sullivan*, 2 F.3d 692 (6th Cir. 1993); *Casey v.
Secretary of Health & Human Services*, 987 F.2d 1230, 1233 (6th Cir.

19

1993). A court may, under certain circumstances, remand a case under Sentence 6 of 42 U.S.C. § 405(g) for further administrative proceedings in light of new and material evidence. *See Cline,* 96 F.3d at 148. However, plaintiff does not seek a Sentence 6 remand.

Second, the administrative law judge expressly considered plaintiff's testimony at the administrative hearing and her subjective complaints of pain but found that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the" RFC assessment found by the administrative law judge. *PAGEID* 71. Plaintiff does not challenge this determination.

Finally, there is substantial evidence in the record to support the administrative law judge's determination that plaintiff does not meet Listing 1.02. Plaintiff has established that she had knee surgeries in January and February 2009, *see PAGEID* 521, 557-58, that she experienced right knee pain before and after the surgeries, *see e.g., PAGEID* 707-08 (October 2008), 519 (December 2008), 515 (January 2009), 599 (April 2009), 674 (July 2009), 818-19, 826-29 (December 2010), 749 (January 2010), and that, at times, she walked with an antalgic gait. *See PAGEID* 543 (October 2008), 593 (December 2008), 541 (February 2009), 572 (March 2009), 819 (December 2010), 538-39, 554-55 (knee pain interfering with ambulation in February 2009). *But see PAGEID* 589 (walked with a normal gait in January 2009), 541 (February 2009), 740 (October 2009), 740 (November 2009), 749 (January 2010), 540 (able to ambulate without difficulty in March 2009). Nevertheless, in order to meet Listing 1.02, plaintiff must establish

an inability to ambulate effectively.  No doctor has ever prescribed,
and there is no evidence that plaintiff has ever used, a walker, two
crutches, or two canes, *cf*. *PAGEID* 705 (September 2009 physical
therapy notes stating that plaintiff used a cane).  The record
contains no medical opinion that plaintiff was unable to walk to the
degree required by the Listing, and there is no evidence that any
doctor has ever opined that plaintiff's combination of impairments
meets Listing 1.02.  Plaintiff's activities of daily living also
suggest that she is able to ambulate effectively.  Plaintiff can climb
stairs, *PAGEID* 732-33 (June 2008), 749 (January 2010), she walks four
to five blocks, *see PAGEID* 100-01, 645, she organizes her house for
approximately seven or eight hours per day, *PAGEID* 103, 107-08, 110-
11, she does dishes and laundry, she cooks dinner, she takes out the
trash, she bends over to put pots, pans, and groceries in cabinets,
*PAGEID* 107-08, 112, and she drives to the grocery store weekly.  *Id*.
Plaintiff was able to help her daughter move for 14 hours in a single
day in December 2009, *PAGEID* 751, 756, she is able to take her
grandchildren to their doctor appointments, *see PAGEID* 756, she is
able to bring infant and toddler grandchildren to her own doctor
appointments, *PAGEID* 773-75, 790, and she is able to babysit up to
five grandchildren at a time.  *See PAGEID* 724 (May 2007), 484
(December 2008), 599, 645, 685 (June 2009), 674 (July 2009), 754, 775
(April 2010), 774 (June 2010), 778, 805, 773 (in July 2010 plaintiff
was "still working 6 days a week baby setting [sic] her 3
grandchildren at her daughter's for close to 12 hrs a day"), 792-93,
771 (in August 2010 plaintiff "talked about having to baby set [sic]

21

for her daughter's 5 children only 4 days a week instead of 7 now"),
791 (September 2010), 790 (in October 2010 plaintiff was watching five
grandchildren, caring for her daughter who was expecting back surgery,
and still "fight[ing] to adopt" three other grandchildren.), 802
(November 2010). There is also no evidence to support plaintiff's
argument, *see Statement of Errors*, pp. 22-23, that she cannot "walk a
block at a reasonable pace on rough or uneven surfaces."

In short, there is no evidence that plaintiff has an "extreme
limitation of the ability to walk" that "interferes very seriously
with [her] ability to independently initiate, sustain, or complete
activities." Plaintiff has therefore not carried her burden of
establishing that she satisfies the requirements of Listing 1.02.
*See, e.g.*, *Bingaman v. Comm'r of Soc. Sec.*, 186 F. App'x 642, 645 (6th
Cir. 2006). Accordingly, the administrative law judge's decision is
substantially supported in this regard.

Plaintiff's *Statement of Errors* also summarily challenges the
administrative law judge's RFC assessment for a reduced range of light
work:

> It is clear that Ms. Shackleford has had considerable knee
> impairments that have resulted in several surgical
> procedures. The record supports a finding that Ms.
> Shackleford's condition meets or equals Listing 1.02.
> However, even if it does not, the evidence clearly shows
> that Ms. Shackleford would not be capable of light work,
> which is what the ALJ noted she could perform.

*Statement of Errors*, p. 26. The Commissioner argues — with some
justification — that plaintiff's one-sentence critique of the
administrative law judge's RFC assessment is so conclusory that it

22

should be deemed waived.  *Commissioner's Response*, p. 7 (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)).  Even if not waived, plaintiff's argument is without merit.

The residual functional capacity determination is an administrative finding of fact reserved to the Commissioner.  20 C.F.R. §§ 404.1527(d)(2), (3), 416.927(d)(2), (3); *Edwards v. Comm'r of Soc. Sec.*, 97 F. App'x 567, 569 (6th Cir. 2004).  It represents the most, not the least, that a claimant can do despite her impairments.  20 C.F.R. §§ 404.1545(a), 416.945(a); *Griffith v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007).  In assessing a claimant's residual functional capacity, an administrative law judge must consider all relevant evidence, including medical source opinions, relating to the severity of a claimant's impairments.  *See* 20 C.F.R. §§ 404.1527(d), 404.1545(a), 416.927(d), 416.945(a).  Furthermore, courts have stressed the importance of medical opinions in determining a claimant's residual functional capacity, and have cautioned administrative law judges against relying on their own expertise in drawing conclusions from raw medical data.  *See Isaacs v. Astrue*, No. 1:08-CV-828, 2009 WL 3672060, at *10 (S.D. Ohio Nov. 4, 2009) (quoting *Deskin v. Comm'r Soc. Sec.*, 605 F.Supp.2d 908, 912 (N.D. Ohio 2008)).

In the case presently before the Court, the administrative law judge found that plaintiff had the RFC to perform light work, except that she would be limited to:

> unlimited pushing and pulling; no climbing of ramps or stairs; avoiding all exposure to operational control of moving machinery and unprotected heights; and work is limited to simple, routine, and repetitive tasks with no fast paced production requirements and with only brief and

23

superficial interaction with the public, co-workers, and supervisors.

*PAGEID* 70. In making this assessment, the administrative law judge expressly considered all the medical opinions and provided an explanation for the weight given to each. *PAGEID* 73-75. The administrative law judge expressly adopted the opinions of the state agency physicians, Drs. McCloud and Collins, and discounted the July 2010 opinion of Dr. Frazier and the July 2009 and April 2010 opinions of Dr. Hamill. *Id.*

Plaintiff refers to Dr. Frazier's December 2005 medical opinion as evidence that she could not perform light work. *See Statement of Errors*, pp. 23, 26. However, that opinion is not relevant here because it predated plaintiff's alleged onset date by nearly three years. Accordingly, the administrative law judge's residual functional capacity assessment is supported by substantial evidence in the record.

In short, the Court concludes that the decision of the Commissioner applied all appropriate standards and is supported by substantial evidence in the record.

It is therefore **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED** and that this action be **DISMISSED.**

If any party seeks review by the District Judge of this *Report and Recommendation*, that party may, within fourteen (14) days, file and serve on all parties objections to the *Report and Recommendation*, specifically designating this *Report and Recommendation*, and the part thereof in question, as well as the basis for objection thereto. 28

24

U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Response to objections must be filed within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to *de novo* review by the District Judge and of the right to appeal the decision of the District Court adopting the *Report and Recommendation*. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Smith v. Detroit Fed'n of Teachers, Local 231 etc.*, 829 F.2d 1370 (6th Cir. 1987); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


June 6, 2013                               *s/Norah McCann King*
                                        Norah M<sup>c</sup>Cann King
                                   United States Magistrate Judge